UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                       )
DAVID WILSON,                          )
                                       )
            Plaintiff,                 )
                                       )   Civil Action No. 16-1015 (RBW)
      v.                               )
                                       )
U.S. DEPARTMENT OF JUSTICE, et al.,    )
                                       )
            Defendants.                )
_____)

**MEMORANDUM OPINION**

The pro se plaintiff, David Wilson, who is incarcerated, filed this civil case, alleging that the defendants, the United States Department of Justice (the "Department") and the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "Bureau"), violated the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2012), by failing "to release [to him] the requested information pertaining to his requests under the FOIA." Complaint ("Compl.") at 1. Currently before the Court is the Defendants' Motion for Summary Judgment ("Defs.' Mot."). After carefully considering the parties' submissions,[1] the Court concludes for the reasons set forth below that it must grant the defendants' motion for summary judgment.

### I. BACKGROUND

**A. Facts Regarding the Plaintiff's Conviction**

"In November 2007, a jury convicted [the plaintiff] of aiding and abetting the August 17,

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem."); (2) the Defendants' Statement of Material Facts as to Which There Is No Genuine Issue ("Defs.' Facts"); (3) the Declaration of Stephanie M. Boucher, Chief, Disclosure Division, Bureau of Alcohol, Tobacco, Firearms and Explosives ("Boucher Decl."); (4) the Plaintiff's Opposition to the Defendant[s'] Motion for Summary Judgment ("Pl.'s Opp'n"); and (5) the Reply in Support of Defendant[s'] Motion for Summary Judgment ("Defs.' Reply").

1998[] first-degree double murder of Sabrina Bradley and Ronnie Middleton." Defs.' Mem. at 1. During his trial, the government introduced evidence that the plaintiff was "a member of a [District of Columbia] gang called [the] Congress Park Crew [and] was particularly close with an associate named Maurice Doleman, whom he regarded as a brother." Id.; see also Pl.'s Opp'n at 3. Doleman allegedly "robbed the girlfriend of one of the [rival] gang's members," and "[i]n retaliation, the boyfriend paid Ronnie Middleton and another member of the [rival] gang to kill . . . Doleman, which . . . they did." Defs.' Mem. at 1; see also Pl.'s Opp'n at 3–4.

As further support of the plaintiff's involvement in the murders, the government also presented evidence that, on August 17, 1998, the plaintiff "was driving with two other Congress Park members—Antonio Roberson and Antoine Draine—when they came upon . . . Middleton sitting in a Ford Bronco." Defs.' Mem. at 1–2; see also Pl.'s Opp'n at 4. The plaintiff, with his passengers, then drove to his house, "retrieved a .9mm Glock handgun," "drove back to . . . [the location where] Middleton [had been observed]," and "Roberson opened fire on the Bronco." Defs.' Mem. at 2; see also Pl.'s Opp'n at 4. Sabrina Bradley, Middleton's girlfriend, and "a gentleman nicknamed Teeny Man" were in the Bronco with Middleton. Defs.' Mem. at 2. Bradley and Middleton were struck by the bullets fired by Roberson, and they later "died of their gunshot wounds" at a hospital; "Teeny Man managed to escape through a window and fled." Id.; see also Pl.'s Opp'n at 4.

"Four witnesses . . . testified at trial about [the plaintiff's] role in the murders." Defs.' Mem. at 2. One of the witnesses, Bobby Capies, who was also a member of the Congress Park gang, testified that the plaintiff "described to him the events recounted above." Id. In light of this and other evidence, the jury found the plaintiff guilty. See id. The plaintiff appealed his conviction and sentence, alleging that the prosecution did not disclose a report summarizing a

police interview with Capies in violation Brady v. Maryland, 373 U.S. 83 (1963). See id. Despite another member of this Court's post-conviction agreement that the summary report should have been disclosed by the government, the plaintiff's demand for a new trial was denied and that ruling was affirmed by the District of Columbia Circuit. See id. at 2–3; see also United States v. Bell, 795 F.3d 88 (D.C. Cir. 2015).

The plaintiff nonetheless remains convinced that the government did not disclose to him all exculpatory evidence that would have altered the outcome of his trial. See Pl.'s Opp'n at 7. Specifically, the plaintiff asserts that the Metropolitan Police Department ("MPD") and the Bureau conducted a controlled operation on June 14, 1999, whereby they enlisted a confidential informant to record a conversation with Antonio Roberson. See id. at 4–6. Detective Michael Will's written report of the operation indicated that the informant was able to record Roberson confessing to the murders. See id. According to the plaintiff, the tape recording, which was never disclosed to him, "unequivocally exonerates him of having any involvement with the murders." Id. at 6.

### B. Facts Regarding the Plaintiff's FOIA Request

On April 21, 2015, the plaintiff sent the Bureau a "FOIA request seeking a copy of [the] tape recording and transcript of a conversation between [the] alleged confidential informant and Antonio Robinson." Defs.' Facts ¶ 3; see also Boucher Decl., Exhibit ("Ex.") A (FOIA Request dated April 21, 2015); Pl.'s Opp'n at 8.[2] Having failed to receive a response to his FOIA request

---

[2] As the parties acknowledge, the plaintiff sent FOIA requests to the MPD and the Executive Office of United States Attorneys ("EOUSA"), seeking the same tape recording and transcript, and upon the agencies' failure to locate and produce the requested records, the plaintiff filed suit against the MPD and the EOUSA asserting violations of the FOIA. See Defs.' Mem. at 3–4; see also Pl.'s Opp'n at 7–8. The plaintiff's claims against the MPD were dismissed for lack of subject matter jurisdiction, and with respect to his claims against the EOUSA, another member of this Court granted the agency's motion for summary judgment, even though the agency was unable to locate the tape recording. See Pl.'s Opp'n at 8; see also Wilson v. U.S. Dep't of Justice, 2014 WL 12539334, at *4 (D.D.C. Oct. 17, 2014).

from the Bureau, on June 8, 2015, the plaintiff sent a letter to the Bureau, notifying the agency of its failure to timely respond to his FOIA request. See Defs.' Facts ¶ 4; see also Boucher Decl., Ex. B (letter from the plaintiff to the Bureau dated June 8, 2015). Additionally, on that same day, the plaintiff resubmitted his April 21, 2015 FOIA request, attaching to it a Certification of Identity for Antonio D. Roberson and an obituary for Roberson. See Boucher Decl., Ex. D (resubmission of April 21, 2015 FOIA Request); see also Defs.' Facts ¶ 6; Pl.'s Opp'n at 9. On June 19, 2015, the Bureau responded to the plaintiff's original April 21, 2015 FOIA request, advising the plaintiff that, because his original FOIA request sought "information relating to a third party," it "refus[ed] to confirm or deny the existence of responsive records pursuant to Exemptions 6 and 7(C) of the FOIA" without the third party's "consent[ or] proof of death, an official acknowledgment of an investigation of [the third party,] or an overriding public interest." Boucher Decl., Ex. C (letter from the Bureau to the plaintiff dated June 19, 2015) at 1; see also Defs.' Facts ¶ 5; Pl.'s Opp'n at 9.

Thereafter, on July 15, 2015, the Bureau received the plaintiff's June 8, 2015 resubmitted FOIA request. See Boucher Decl., Ex. D (resubmission of April 21, 2015 FOIA Request). On August 20, 2015, the Bureau sent the plaintiff a letter acknowledging receipt of his resubmitted FOIA request. See id., Ex. E (letter from the Bureau to the plaintiff dated August 20, 2015); see also Defs.' Facts ¶ 7; Pl.'s Opp'n at 9–10. Then, on August 25, 2015, the plaintiff sent the Bureau a letter indicating that he had not received a response to his June 8, 2015 FOIA request; the Bureau received this letter on September 2, 2015. See Boucher Decl., Ex. F (letter from the plaintiff to the Bureau dated August 25, 2015).

In response to the plaintiff's June 8, 2015 resubmitted FOIA request, the Bureau "initiated a preliminary search of the Treasury Enforcement Communication System ('TECS')

4

and N-Force, which are two law enforcement databases that would most likely contain information pertaining to [the p]laintiff." Defs.' Facts ¶ 10. The Bureau "found no responsive records" as a result of these searches. Id. ¶ 14. The Bureau then "concluded that any criminal investigation associated with [the p]laintiff's criminal case would have originated in the Washington Field Division and deemed it as the component likely to possess responsive records, given the nature and venue of the criminal case referenced in [the p]laintiff's FOIA request." Id. ¶ 15. Thus, the Bureau "submitted a search request to [its] Washington Field Division on August 20, 2015." Id. ¶ 16. After receiving no response to his resubmitted request, see id. ¶ 8, on May 31, 2016, the plaintiff filed this action against the defendants, and after receiving notification of the plaintiff's suit, see id. ¶ 9, the Bureau, on July 18, 2016, "again contacted [its] Washington Field Division to determine if they had located any responsive records," id. ¶ 17. Subsequently, "the Washington Field Division conducted a search of TECS, N-Force, and its accession and transfer records located in the Washington Field Division and found no responsive records." Id. ¶ 18. Additionally, the Washington Field Division searched its "accession and transfer records for all cases opened during fiscal years ("FY") 1998 and 1999." Id. ¶ 20.[3] "[A] search of the accession and transfer records for FY [19]99 revealed no responsive records," but a "search of the FY [19]98 records revealed the existence of the 7th District Assault with Intent to Kill ('AWIK') file." Id. ¶ 21.

"'AWIK' was a violent-crime initiative engaged in by Special Agents assigned to Group II of the Washington Field Division in FY [19]98 and [19]99. The purpose of the initiative was

---

[3] The Bureau notes that "'[a]ccession' refers to the process of transferring both physical custody and legal ownership of [f]ederal records from an agency to the National Archives and Records Administration ('NARA') for permanent preservation," and therefore, "[r]ecords that qualify for permanent transfer following their retention period . . . are categorized as 'accession records.'" Defs.' Facts. ¶ 19. On the other hand, "'transfer records' are closed records moved from an agency to NARA's Federal Records Center . . . for storage during their retention period." Id. Transfer records remain in the "transferring agency['s] . . . legal custody . . . until their final disposition." Id.

to assist the [MPD] with solving and reducing violent crimes involving firearms in the District of Columbia." Id. ¶ 22.[4] Regarding the criminal investigation of the plaintiff, the Bureau stated that

> any information, evidence or transcript retained by [the Bureau] regarding assistance provided to [the] MPD on a murder investigation under the AWIK initiative would have [been] documented or stored in the 7th District AWIK file folder, [as] 742207-98-0020, because the murder in question occurred on Congress Place Southeast, Washington, D.C.—within District 7—in FY [19]98.

Id. ¶ 24. However, "[t]he Washington Field Division was unable to locate . . . [the accession or transfer transmittal form submitted to NARA] for the District 7 AWIK file folder corresponding to case number 742207-98-0020." Id. ¶ 26. The Washington Field Division then "attempted to find a duplicate copy of the transmittal [record] submitted to NARA within the files maintained by [its] Records Management Office." Id. ¶ 27. Unable to find a duplicate copy, see id. ¶ 29, the Bureau "sought an opinion from NARA regarding whether the District 7 AWIK file could be retrieved with the case number but without the NARA transmittal form," id. ¶ 30. NARA responded that its staff was "unable to locate the requested records" based on the information provided and requested additional information to locate the requested material. Id. ¶ 31. Unable to provide NARA with any additional information, see id., the Bureau concluded that it had conducted a reasonable search to locate the requested materials, satisfying its search obligation under the FOIA, and now moves for summary judgment.

## II. STANDARD OF REVIEW

The Court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[4] The Bureau acknowledges that "[t]he accession/transfer record listing the 7th District AWIK file . . . does not clearly denote whether the 7th District AWIK file was submitted to NARA for storage purposes as a transfer record or permanently as an accession record." Defs.' Facts ¶ 23.

law." Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). The Court must, therefore, draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The non-moving party, however, cannot rely on "mere allegations or denials." Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248). Thus, "[c]onclusory allegations unsupported by factual data will not create a triable issue of fact." Pub. Citizen Health Research Grp. v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (alteration in original) (quoting Exxon Corp. v. FTC, 663 F.2d 120, 126–27 (D.C. Cir. 1980)). If the Court concludes that "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, at bottom, "in ruling on cross-motions for summary judgment, the [C]ourt shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." Shays v. FEC, 424 F. Supp. 2d 100, 109 (D.D.C. 2006) (citation omitted).

FOIA cases are typically resolved on motions for summary judgment. Ortiz v. U.S. Dep't of Justice, 67 F. Supp. 3d 109, 116 (D.D.C. 2014); Defs. of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). "[The] FOIA requires federal agencies to disclose, upon request, broad classes of agency records unless the records are covered by the statute's exemptions." Students Against Genocide v. U.S. Dep't of State, 257 F.3d 828, 833 (D.C. Cir. 2001) (citation omitted). To prevail on a motion for summary judgment in a case brought under

7

the FOIA when the adequacy of an agency search is challenged, the "defending 'agency must show beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents.'" Morley v. CIA, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983)); see also Summers v. U.S. Dep't of Justice, 140 F.3d 1077, 1080 (D.C. Cir. 1998) (explaining the "peculiar nature of the FOIA" as it relates to summary judgment review). And courts apply a reasonableness test to determine the adequacy of a search methodology. Morley, 508 F.3d at 1114. Thus, a "FOIA search is sufficient if the agency makes 'a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'" Baker & Hostetler LLP v. U.S. Dep't of Commerce, 473 F.3d 312, 318 (D.C. Cir. 2006) (quoting Nation Magazine v. U.S. Customs Serv., 71 F.3d 885, 890 (D.C. Cir. 1995)).

"Agency affidavits [submitted in FOIA cases] are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., Inc. v. U.S. Sec. & Exch. Comm'n, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted). Accordingly, once the agency has "shown that its search was reasonable, the burden is on the requester to rebut that evidence by a showing that the search was not conducted in good faith." Moore v. Aspin, 916 F. Supp. 32, 35 (D.D.C. 1996) (citing Miller v. U.S. Dep't of State, 779 F.2d 1378, 1383 (8th Cir. 1985)). "This [rebuttal] can be done either by contradicting the [agency's] account of the search procedure or by [presenting] evidence [showing] the [agency's] bad faith." Id. at 35–36 (citing Miller, 779 F.2d at 1384).

### III.   ANALYSIS

The plaintiff argues that "summary judgment [in favor of the Bureau] is not appropriate," Pl.'s Opp'n at 14, and challenges the adequacy of the Bureau's search based on the Bureau's (1)

8

failure to search the 7th District AWIK File for responsive records, see id. at 15–16; and (2) the methods used to conduct its search for the requested records, see id. at 20–25. The Court will address these challenges in turn.

### A. The Bureau's Search of the 7th District AWIK File

As support for its position that it has conducted a reasonable search, the Bureau submitted a declaration from Stephanie M. Boucher, the Chief of the Bureau's Disclosure Division. See generally Boucher Decl. In her declaration, Boucher notes that the 7th District AWIK File "may or may not contain information that is relevant to [the p]laintiff's [FOIA] request." Boucher Decl. ¶ 22. In light of this representation, the plaintiff contends that

> when an agency states that one of its files may contain the information requested in a FOIA request, but that it cannot search that file due to internal inadequacies in record keeping at the agency, the agency has clearly not fulfilled its duty under the FOIA, and thus, is not entitled to summary judgment.

Pl.'s Opp'n at 17. The plaintiff also argues that the Bureau's reasons for not searching the 7th District AWIK File "are highly questionable and inconsistent with the requirements of the FOIA". Id. at 19; see also id. at 18–19 (asserting that the Bureau "should be required to explain, and present evidence, as to why it cannot provide NARA with sufficient information to retrieve its AWIK File" or provide "insight or explanation on what the retrieval requirements are or what information is necessary"). The Court disagrees.

"It is well-settled that if an agency has reason to know that certain places may contain responsive documents, it is obligated under [the] FOIA to search barring an undue burden." Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 327 (D.C. Cir. 1999). However, "[n]othing in law requires the agency to document the fate of documents it cannot find. If a reasonable search fails to unearth a document, then it makes no difference whether the document was lost, destroyed, stolen, or simply overlooked." Roberts v. U.S. Dep't. of Justice, Civ. Action No.

9

92-1707 (NHJ), 1995 WL 356320, at *2 (D.D.C. Jan. 29, 1993). Thus, "[w]hen an agency cannot locate a document, FOIA only requires the agency to show that it has made a reasonable search." Whitaker v. CIA, 31 F. Supp. 3d 23, 46 (D.D.C. 2014) (alteration in original) (quoting Roberts, 1995 WL 356320, at *2).

Here, the Court concludes that the Bureau "made a good faith effort to conduct a search for" the requested tape recording and transcript. Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990). As the Bureau correctly notes, it is only required to "undertake a search that is 'reasonably calculated to uncover all relevant documents,'" Defs.' Mem. at 7 (quoting Weisberg, 705 F.2d at 1351), and its search is not inadequate simply because it failed to "uncover[] every document extant," id. (alteration in original) (quoting SafeCard Servs., 926 F.2d at 1201); see also Steinberg v. U.S. Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994) ("The question is not 'whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate." (emphases in original) (quoting Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984)). In her declaration, Boucher noted that the Bureau was unable to locate the standard transmittal form submitted to NARA corresponding to case number 742207-98-0020, see Boucher Decl. ¶ 27, and the standard transmittal form "include[d] identifying information that would allow NARA to locate a file based on the assigned transmittal number provided by NARA," id. ¶ 26. The Bureau then attempted to locate a duplicate copy of the transmittal form submitted to NARA in its Records Management Office, but was unable to do so. See id. ¶¶ 28–29. When that effort failed, the Bureau contacted NARA and queried "whether the District 7 AWIK file could be retrieved with the case number but without the NARA transmittal form." Id. ¶ 30. NARA responded that it "was unable to locate the requested records" based on that information alone, and it would need

10

additional information from the Bureau (i.e., an assigned transmittal number), id. ¶ 31 (citation omitted); see also Defs.' Reply at 2, which the Bureau did not have, see Boucher Decl. ¶ 32. Furthermore, Boucher represented that the Bureau searched the "accession and transfer records in the Washington Field Division using all personal identifiers provided by [the p]laintiff, and institutional knowledge regarding AWIK files." Id. ¶ 34. Consequently, based on Boucher's declaration and the representations contained therein, the Court finds that the Bureau made a good faith effort to uncover the 7th District AWIK file.

Moreover, contrary to the plaintiff's proposition that Boucher acknowledged that the requested records are located in the 7th District AWIK file, see Pl.'s Opp'n at 17; see also id. at 15–16 (claiming that the requested records must be in the AWIK file because the Bureau's search of its other databases yielded no responsive records), Boucher stated only that the 7th District AWIK file "may or may not contain information that is relevant to [the p]laintiff's [FOIA] request," Boucher Decl. ¶ 22 (emphasis added). This statement is best characterized as nothing more than mere speculation that there was a possibility that the requested records (i.e., the tape recording and transcript) may be in the file, and as the Bureau has clarified,

> [i]ndeed, there is no indication that the recording sought by [the plaintiff] would likely be in that file. The [Bureau] knows only that it provided investigatory assistance to [the] MPD through the AWIK program and that it has a file called '7th District AWIK,' making it possible that a responsive record could be located therein.

Defs.' Reply at 2 (emphasis in original); see also Boucher Decl. ¶ 22. As the Circuit has observed, "[m]ere speculation that as yet uncovered documents may exist does not undermine the finding that the [Bureau] conducted a reasonable search." Steinberg, 23 F.3d at 552 (quoting SafeCard Servs., Inc., 926 F.2d at 1201). Thus, although the Bureau was unable to locate the 7th District AWIK file, the Court concludes that the Bureau's good faith effort satisfied its

11

obligations under the FOIA to conduct an adequate and reasonable search for the requested records as it relates to the 7th District AWIK file.

B. **The Bureau's Methods of Search**

The plaintiff also challenges the adequacy of the Bureau's search because "[t]he fact that the [Bureau] claims to have uncovered [no] responsive records to [his] FOIA requests[] suggests that [the Bureau's] method of search was not sufficient to uncover the requested information." Pl.'s Opp'n at 21. In addition, the plaintiff argues that the Bureau failed to "identify the methods of search that would be most effective in producing the requested information." Id. at 20. Again, the Court disagrees.

Similar to what has been noted earlier, "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C. Cir. 2003) ("[I]t is long settled that the failure of an agency to turn up one specific document in its search does not alone render a search inadequate."). "[P]erfection is not the standard. Instead, 'the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'" Budik v. Dep't of Army, 742 F. Supp. 2d 20, 30 (D.D.C. 2010) (quoting Oglesby, 920 F.2d at 68). An agency can discharge its burden "by submitting reasonably detailed, nonconclusory affidavits describing its efforts." Baker & Hostetler, 473 F.3d at 318 (citations omiited). And the affidavits submitted "should 'denote which files were searched,' by whom those files were searched, and reflect a 'systematic approach to document location.'" Liberation Newspaper v. U.S. Dep't of State, 80 F. Supp. 3d 137, 144 (D.D.C. 2015) (quoting Weisberg v. U.S. Dep't of Justice, 627 F.2d 365, 371 (D.C. Cir. 1980)); see also Oglesby, 920 F.2d at 68 ("A reasonably

12

detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched, is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment.").

Here, the contents of Boucher's declaration are sufficient to discharge the Bureau's burden under the FOIA. In her declaration, Boucher stated that the TECS and N-Force law enforcement databases are the databases "that would most likely contain information pertaining to [the p]laintiff." Boucher Decl. ¶ 10. The TECS database "is a computerized information system designed to identify individuals and businesses suspected of or involved in violation of federal law." Id. ¶ 11. And, because it "contains the names of the individuals [the Bureau] has investigated[, it] was the place most likely to locate responsive records." Id. The N-Force database "is a case management system designed to support [the Bureau's] law enforcement operations and acts as a single-point of data entry system, which enables users to store, utilize, and query investigative information, and to prepare investigative documents." Id. ¶ 12. In essence, the "N-Force [database] is [the Bureau's] official case file of record for documenting investigative activity and information, creating reports, tracking investigative leads and linking data." Id. According to Boucher,

> [i]nformation in N-Force may be queried by information regarding an individual, including name, date of birth or social security number, by property or vehicles associated with an individual, or through a full text search which identifies specific words found in [the Bureau's] Reports of Investigation which are contained in the database.

Id. Understanding that these two databases would be the most likely sources to yield responsive documents, "an employee of the [Bureau's] Disclosure Division searched both TECS and

N-Force for [the p]laintiff's name, Social Security number, and date of birth, as provided by [the p]laintiff" and the same "employee also searched . . . for Antonio Robinson, also known as Antonio Roberson, in conjunction with the date of birth noted for Mr. Robinson in [the p]laintiff's FOIA request." Id. ¶ 13. No responsive records were found. Id. ¶ 14.

Boucher then stated that the Bureau determined that its Washington Field Division would likely possess responsive records, and therefore requested that that office also conduct a search. See id. ¶¶ 15–18. The Washington Field Division then searched TECS, N-Force, and its accession and transfer records

> based on a search of (i) [the p]laintiff's name, Social Security number, and date of birth; (ii) Antonio Robinson also known as Antonio Roberson in conjunction with his date of birth; and (iii) only the names of Ronnie Middleton and Sabrina Bradley, since no additional information was provided for these two individuals in [the p]laintiff's FOIA request.

Id. ¶ 19; see also id. ¶ 20 (noting that the Washington Field Division searched the accession and transfer records for FY 1998 and 1999, using the date and location where the plaintiff alleges the recording and crime occurred, District of Columbia Homicide Detective Will's June 14, 1999 report, and institutional knowledge by employees familiar with the Division's practices during the relevant time period). The Division's search also uncovered no responsive documents. See id. ¶¶ 21–32.

Based on these considerable details, the Court is satisfied that the Bureau conducted an adequate search reasonably calculated to uncover the requested records, even though its search yielded no responsive documents. Although not expressed exactly as the plaintiff would like, see Pl.'s Opp'n at 21 (asserting that "unless the [Bureau] can state that its method of search was the proper and most effective method for discovering potential responsive information to [his] FOIA request, then [the Bureau] can hardly claim that its search was sufficiently adequate to discover

the requested information"), Boucher's declaration provides that the Bureau searched all sources likely to uncover responsive documents, see Boucher Decl. ¶ 35 (noting that the Bureau "searched in all of the files and indices that are reasonably likely to contain responsive records"), and searched those sources using all the information provided by the plaintiff within the parameters established for searching those sources, see Boucher Decl. ¶¶ 10–14, 19–32. Contrary to the plaintiff's assertion, see Pl.'s Opp'n at 21, the fact that the Bureau did not uncover any responsive records despite these efforts does not undermine the adequacy of the Bureau's search and its search methods, given the extensive details outlined in Boucher's declaration. And as the Bureau explains, the results of its search "[are] not surprising, since it appears that the [Bureau] merely assisted the MPD in its investigation and did not conduct an investigation of its own." Defs.' Reply at 3. In any event, the plaintiff does not offer any factual evidence that genuinely rebuts the presumption of good faith accorded agency declarations. See Pl.'s Opp'n at 17. Rather, in mere conclusory fashion, the plaintiff asserts that there is evidence of bad faith, because "the writer of the declaration (i.e., Stephanie Boucher) is the same person who, in bad faith, arbitrarily denied [his] FOIA requests." Id. Such conclusory allegations are not sufficient to defeat summary judgment. See Barouch v. U.S. Dep't of Justice, 962 F. Supp. 2d 30, 49 (D.D.C. 2013) ("[W]here a plaintiff has not provided evidence that an agency acted in bad faith, 'a court may award summary judgment solely on the basis of information provided by the agency in declarations.'" (quoting Moore v. Bush, 601 F. Supp. 2d 6, 12 (D.D.C. 2009))).

Notwithstanding Boucher's declaration, the plaintiff contends that the Bureau's search was inadequate because it "failed to contact either Agent Hester or Agent Will," the agents who conducted the operation that resulted in the tape recording confession and transcript, "to learn [of] the location of the requested records." Id. at 24. As support for his position, see Pl.'s Opp'n

15

at 24, the plaintiff relies on <u>Valencia-Lucena v. United States Coast Guard</u>, wherein the Circuit held that "[w]hen all other sources fail to provide leads to the missing record, agency personnel should be contacted if there is a close nexus . . . between the person and the particular record," <u>Valencia-Lucena</u>, 180 F.3d at 328. The Circuit, however, noted that "such an inquiry was required," unless there was an "indication that [the] inquiry . . . would be fruitless, either because [the agency personnel] is no longer . . . [employed at the agency] or because the storage of the [requested records] was controlled by other persons or by internal procedures." <u>Id.</u> Here, as the Bureau notes, <u>see</u> Defs.' Reply at 3–4, contacting Agent Hester or Agent Will would have been fruitless, as the Bureau searched for the requested records using the sources established by its internal procedures for storage of investigative records, <u>see</u> Boucher Decl. ¶¶ 10–12.[5]

In sum, although no responsive documents were uncovered, the record indicates that the Bureau undertook "an informed, detailed, and good faith search of sources likely to reveal documents responsive to [the p]laintiff's . . . FOIA request." <u>Budik</u>, 742 F. Supp. 2d at 31. Additionally, the plaintiff has failed to offer countervailing evidence sufficient to raise a substantial doubt as to the Bureau's good faith. Accordingly, the Court finds that summary judgment in favor of the Bureau is warranted, as "there is no genuine issue as to the reasonableness of [the Bureau's] search." <u>Id.</u>

## IV.     CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the defendants' motion for summary judgment.

---

[5] As a last attempt to challenge the adequacy of the Bureau's search, the plaintiff also argues that "Boucher's declaration does not attempt to identify the person(s) responsible for maintaining and transferring the requested records to NARA [who] could have also provided the [Bureau] with the location of the requested records and/or information for obtaining the records." Pl.'s Opp'n at 25. The Court finds this argument meritless, as the reasoning for why contacting either Agent Hester or Agent Will would be fruitless applies equally to this argument.

16

**SO ORDERED** this 18th day of September, 2017.[6]

REGGIE B. WALTON
United States District Judge

---

[6] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.